**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

CATALINO ESPINOSA,

                                          Plaintiff,

          v.                                                    No. 10-CV-497
                                                                   (MAD/DRH)
McCABE, Sergeant, Bare Hill Correctional
Facility; ARQUETTE, Officer, Bare Hill
Correctional Facility; LEON CARTER,
Correction Officer, *also known as* Canton;
SOUTHWORTH, Officer, Bare Hill
Correctional Facility; JOHN DOE, Registered
Nurse, Bare Hill Correctional Facility; JANE
DOE #1, Registered Nurse, Bare Hill
Correctional Facility; JANE DOE #2,
Registered Nurse, Bare Hill Correctional
Facility; and JOHN DONELLI, Superintendent,
Bare Hill Correctional Facility,

                                          Defendants.
_____

**APPEARANCES:**                          **OF COUNSEL:**

CATALINO ESPINOSA
03-A-4139
Plaintiff Pro Se
Wende Correctional Facility
Post Office Box 1187
Alden, New York 14004

HON. ERIC T. SCHNEIDERMAN            DEAN J. HIGGINS, ESQ.
New York State Attorney General      Assistant Attorney General
Attorney for Defendants
The Capitol
Albany, New York 12224-0341

**DAVID R. HOMER**
**U.S. MAGISTRATE JUDGE**

**REPORT-RECOMMENDATION AND ORDER**[1]

Plaintiff pro se Catalino Espinosa ("Espinosa"), an inmate in the custody of the New York State Department of Correctional and Community Services ("DOCCS"), brings this action pursuant to 42 U.S.C. § 1983 alleging that eight  DOCCS employees violated his constitutional rights under the Eighth Amendment.  Compl. (Dkt. No. 1).  Presently pending are (1) defendants' motion for summary judgment pursuant to Fed. R. Civ. P. 56 (Dkt No. 40); (2) Espinosa's motion to amend the complaint (Dkt. No. 47); and (3) Espinosa's motion to amend his opposition to defendants' motion for summary judgment (Dkt. No. 54).  All motions are opposed.   For the following reasons it is recommended that defendants' motion be granted in part and denied in part and it is ordered that Espinosa's motions be granted in part and denied in part.


**I.  Background**

The facts are related herein in the light most favorable to Espinosa as the non-moving party.  See Ertman v. United States, 165 F.3d 204, 206 (2d Cir.1999).


**A.  Use of Force**

On July 26, 2007, Espinosa was issued a misbehavior report while he was housed in the dormitories at Bare Hill Correctional Facility.  Espinosa Dep. (Dkt. No. 40-4) at 10

---

[1]This matter was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

(hereinafter "Dep."); Dkt. No. 40-5 at 90.[2] Espinosa was then escorted from his housing unit dormitory to the Special Housing Unit ("SHU")[3] by defendant Corrections Officers Carter and Southworth and defendant Sergeant McCabe. Compl. at 4; Dep. at 11. Upon arriving at SHU, Espinosa was met by defendant Corrections Officer Arquette. Compl. at 4. Once inside the unit, Espinosa was escorted into a separate room used to perform strip searches. Id.. at 4; Dep. at 13.

After being instructed to remove his clothing, Espinosa stated that McCabe "abruptly, viciously and without provocation . . . struck [Espinosa] . . . [in] his left eye, which cause [Espinosa] to fall to the ground." Compl. at 4; Dep. at 17. The remaining three defendants began kicking Espinosa in his legs, knees, and body. Compl. at 4; Dep. at 17-18, 20. The defendants then lifted Espinosa to his feet and began punching his head and body. Compl. at 4; Dep. at 20. McCabe then approached Espinosa, grabbed his throat, and choked him. Compl. at 4; Dep. at 20. Espinosa again fell to the floor where the remaining defendants continued to kick and punch him until he lost consciousness. Compl. at 4; Dep. at 20-21. Throughout the course of the assault, Espinosa contends he never resisted or used force.

---

[2] Espinosa was ultimately found guilty of four of the five infractions cited on the misbehavior report and sentenced to three months in SHU and three months loss of recreation, packages, commissary, phone, and good time credits. Dkt. No. 40-5 at 91, 95-96. It appears that one of the infractions, creating a disturbance, was reheard and, while Espinosa was again found guilty, he was only sentenced to thirty days in SHU and thirty days loss of privileges. Id. at 92. The conviction and sentence were appealed and affirmed on September 26, 2007. Id. at 97.

[3] SHUs exist in all maximum and certain medium security facilities. The units "consist of single-occupancy cells grouped so as to provide separation from the general population . . . ." N.Y. Comp. Codes R. & Regs. tit. 7, § 300.2(b). Inmates are confined in a SHU as discipline, pending resolution of misconduct charges, for administrative or security reasons, or in other circumstances as required. Id. at pt. 301.

Compl. at 4.

McCabe, Carter, and Southworth escorted Espinosa from his dormitory to the SHU. McCabe Decl. ¶ 7; Carter Decl. (Dkt. No. 40-9) ¶ 5; Southworth Decl. (Dkt. No. 40-10) ¶ 5; No. 40-6 at 16.  Upon arrival at SHU, Espinosa was turned over to Arquette for further processing without incident and Carter and Southworth remained outside of the SHU. Carter Decl. ¶¶ 6-7; Southworth Decl. ¶¶ 6-7; No. 40-6 at 16-17.  Carter and Southworth assert they never assaulted Espinosa and never witnessed any other defendant strike him. Carter Decl. ¶ 8; Southworth Decl. ¶ 8; No. 40-6 at 16.  They also never observed any injuries upon Espinosa's person.  Carter Decl. ¶ 9; Southworth Decl. ¶ 9.  McCabe was responsible for supervising Espinosa's admission to the SHU, which included a number of health and safety procedures, one of which was a strip frisk.  McCabe Decl. (Dkt. No. 40-8) ¶¶ 4-5; Dkt. No. 40-6 at 12.  Arquette performed the strip frisk on Espinosa with McCabe present, and concluded that SHU admissions process was professionally completed, without incident, and without any use of force by either himself or McCabe.  Arquette Decl. (Dkt. No. 40-7) ¶¶ 4-7; McCabe Decl. ¶¶ 6, 20, 22; No. 40-6 at 12, 15, 18.

During the frisk, Espinosa was not cooperative, indicating that he did not understand English and did not comprehend what was occurring.  McCabe Decl. ¶ 8; No. 40-6 at 12. McCabe gestured to Espinosa, "such as pulling on [his] shirt, in an effort to convey to [Espinosa] what he needed to do," which ultimately resulted in Espinosa cooperating with the strip frisk.  McCabe Decl. ¶¶ 9-10; see also  No. 40-6 at 12.  McCabe had previously interacted with Espinosa, occasionally using an interpreter, often enough to "know, from experience, that Espinosa understood and c[ould] respond to simple questions."  McCabe Decl. ¶¶ 11-12; see also  No. 40-6 at 12.

4

**B.  Medical Treatment**[4]

After Espinosa lost consciousness, he was awakened by the sound of nurse Hugaboom[5] calling his name.  Compl. at 4; Dep. at 21.  Espinosa claims to have been left without receiving any medical assistance by Arquette, Carter, Southworth, and McCabe, despite Espinosa's alleged moans of pain.  Id. at 6.  It is undisputed that Arquette, Carter, Southworth, and McCabe had no responsibilities to provide medical care to Espinosa. Arquette Decl. ¶ 8; McCabe Decl. ¶ 23; Carter Decl. ¶ 10; Southworth Decl. ¶ 10. Defendants also deny that they were aware of any medical injury requiring any reporting to medical personnel.  McCabe Decl. ¶ 23; Carter Decl. ¶ 11; Southworth Decl. ¶ 11. Espinosa asserts that Hugaboom and defendant Arquette moved him into a SHU cell and leaving him, despite his pleas for medical attention.  Compl. at 4; Dep. at 21-22.  McCabe denies that Espinosa ever lost consciousness or received injuries which required treatment. McCabe Decl. ¶ 21.

McCabe contends that after completing the strip frisk, Hugaboom was called into the room and "attempted to ask questions pertaining to the frisk and explain facility sick call procedures," Which Espinosa acknowledged.  McCabe Decl. ¶¶ 13-14; see also Hugaboom Decl. (Dkt. No. 40-11) ¶¶ 5-7; No. 40-6 at 12, 21.  Hugaboom "did a complete viewing . . . and observed no injuries or medical issues."  McCabe Decl. ¶ 15; Hugaboom Decl. ¶¶ 5, 8; No. 40-6 at 21.  Medical records reflect the same.  Dkt. No. 41 at 174.  Espinosa also failed

---

[4] All references to the medical record will be to the complete set filed by defendants in conjunction with their motion.  See Dkt. Nos. 41 & 41-1.

[5] In his motion to amend the complaint, Espinosa identifies Hugaboom as the individual previously identified as "John Doe I."

to allege to Hugaboom any complaints of assault by staff.  Decl. ¶ 8.  McCabe attempted to continue the admissions procedure, but Espinosa again indicated that he did not understand, so Espinosa was escorted to his SHU cell, without incident, to await the arrival of non-party Serrano who acted as an interpreter and assisted Espinosa in completing the remainder of the admissions forms.  McCabe Decl. ¶¶ 16-18; Serrano Decl. (Dkt. No. 40-12) ¶¶ 4-8; No. 40-6 at 12, 14.  At that time, Espinosa made no complaints of injury to Serrano and there were no visual signs that he had been previously assaulted.  McCabe Decl. ¶ 19; Serrano Decl. ¶¶ 9-10; No. 40-6 at 14.

The following day, Serrano returned to Espinosa's cell on his rounds.  Serrano Decl. ¶ 13.  It was at that time that Espinosa said that he was physically abused during his SHU admission.  Serrano Decl. ¶ 13; No. 40-6 at 14.  Espinosa "claimed that he had fallen during the admission, was picked up by the neck, and that someone had stepped on his knee." Serrano Decl. ¶ 14; see also  No. 40-6 at 14.  Espinosa showed Serrano "a thumb-sized bruise under his right upper arm," and Serrano informed Security.  Serrano Decl. ¶¶ 15-16; see also  No. 40-6 at 14.  Espinosa was escorted to medical where he was examined by nurse Mulverhill[6].  Compl. at 5.  Espinosa contends that no notes were taken during their interaction. Id.. at 5.  The inmate injury report indicates that there were "red marks [with] ecchymosis[7] noted to interior biceps, bilateral [complaints of right] knee discomfort, states has an old injury to the area [and complaints of] pain to [the right] shoulder."  No. 40-6 at

---

[6] Mulverhill was identified in the initial complaint as "Jane Doe."

[7] Ecchymosis is "a small hemorrhagic spot . . . in the skin . . . forming a nonelevated, rounded or irregular, blue or purplish patch."  Dorland's Illustrated Med. Dictionary 524 (28th ed. 1994).

24.  The medical notes indicate that Espinosa was viewed in his shorts after the alleged assault with no additional details.  Dkt. No. 41 at 173.  Espinosa was also previously scheduled to meet with the doctor for preoperative testing.  No. 40-6 at 24.

Espinosa then had x-rays taken of his knee in connection with the previously scheduled testing, but contends that medical staff failed to obtain additional x-rays of his face where there was visible damage.  Compl. at 5; Dep. at 31-33; No. 40-6 at 24.  X-ray results from Espinosa's knee and shoulder showed unremarkable findings with mild degenerative joint disease noted in his knee.  Dkt. No. 41 at 188; <u>see</u> <u>also</u> Dkt. No. 41 at 187 (x-ray results showing similar findings of "moderate osteroarthritic changes" taken in March 2008);182 (x-ray results showing "[m]inimal narrowing of the medial and lateral components . . . probably on the basis of cartilage degeneration," and a screw, which was surgically implanted prior to the use of force, still running "transversely through the . . . tibia" taken in January of 2010). The medical staff also called non-party Officer Gonzales to act as an interpreter and explain the medical statement which had been prepared by Mulverhill in connection with the alleged use of force.  Compl. at 5; No. 40-6 at 22-23.  According to Espinosa, Gonzales merely read the statement, handed it to Espinosa, and instructed him to sign it.  <u>Id.</u> at 5.  Gonzalez attests that "this interview was translated exactly the way the inmate told [him and] . . . at all time while conducting the interpretation . . . [Gonzalez] conducted [him]self in a professional manner."  No. 40-6 at 23.  The inmate injury report which was translated and ultimately signed by Espinosa indicated an alleged assault with Espinosa's sole statement being that he "had a problem on the dorm yesterday and was taken to the box."  No. 40-6 at 24.

Photographs were taken of Espinosa in his shorts.  Compl. at 5; No. 40-6 at 25-27. Espinosa contends that the pictures are not illustrative of his true injuries because they

were taken from such a great distance that the details of the bruising on his face are unrecognizable.  Dep. at 35, 37.  Espinosa was then escorted back to his cell.  Compl. at 5. Espinosa contends that a Catholic priest came to his cell on July 27 and that he was responsible for "put[ting] everything in motion so that they would take [Espinosa] to the hospital and . . . take the pictures."  Dep. at 39.  However the priest remains unidentified. Dep. at 40.

Espinosa contends the lack of treatment persisted throughout his remaining twenty days at Bare Hill Correctional Facility.  Compl. at 6; Dep. at 44 (explaining that he received no treatment for his eyes at Bare Hill).  Espinosa contends that he "pled with [defendant] Superintendent Donelli to intervene; however, the Superintendent also chose to do nothing."  Compl. at 6. Espinosa's medical records indicate that he was seen frequently by medical staff at Bare Hill, six times in two weeks, until his transfer to Auburn.  Dkt. No. 41 at 171-73.  Subsequent visits to medical reveal no additional complaints of any eye, head, knee, or shoulder injuries.  Id.  Additionally, records indicate that Espinosa was being provided with several prescription medications, as well as over-the-counter pain relievers, for a variety of health conditions.  Id.

Due to his the injuries, Espinosa contends he suffered permanent damage to his eye, throat, and knee.  Compl. at 5; Dep. at 22-23, 26; but see Dep. at 28 (admitting that he had previous issues with his knee, including surgical intervention and the placement of pins). Espinosa is now classified as legally blind.  Dep. at 23.  Espinosa's medical records indicate that he has had visual complications, including a "h[istory] of decreasing vision." for twenty years "from [an] old traumatic injury."  Dkt. No. 41-1 at 8.  Espinosa was referred to a specialist multiple times from 2008 through 2010, and his medical records also indicate at

least one eye appointment while housed at Bare Hill.  Dkt. No. 41-1 at 8-11, 19.  An

appointment in June 2008 at the Harrison Eye Center indicated subjective reports of blurry

vision since the trauma he suffered during the use-of-force incident.  Dkt. No. 41-1 at 11.

The eye clinic founmd possible optic nerve damage and requested a retinal evaluation.  Id.

After an appointment with an ophthalmologist and various testing in September 2008 at

Wende Correctional Facility, glaucoma was suspected as the reason for Espinosa's visual

difficulties.  Dkt. No. 41-1 at 16.

Espinosa had another examination with Strong Memorial Hospital in November of 2008

where he reported continual gradual loss of vision in both eyes and it was found that he had

"questionable optic neuropathy" and was suggested to be referred to a neuro-opthalmology

clinic.  Dkt. No. 41-1 at 15.  Espinosa returned to Strong Memorial in January 2009 and was

assessed as having a "functional visual loss" and was recommended to return in three

months to the clinic.  Dkt. No. 41-1 at 7.  By April 2009, Espinosa reported that his vision

was improving, but that he has been having headaches.  Dkt. No. 41-1 at 6.  The

headaches were assessed as a type of migraine and the doctor "suspect[ed] that [the]

episodes of transient bilateral visual loss are related to the migraine."  Id.  Thus, he

recommended a different medication "which works much better for migraine prevention,

especially for [Espinosa's] types of spells."  Id.  During his follow-up appointment in April

2010, there was little noted and it was recommended that he return in another year.  T. 41-1

at 5.

Espinosa's medical records also indicate complaints of a sore throat and persistent

headaches which he attributed to the use of force.  Dkt. No. 41 at 76, 114, 120, 128, 168.

Espinosa was given throat lozenges, warm salt water gargles,  and sent to multiple

9

specialists to have his throat scanned and scoped.  Dkt. No. 41 at 47, 70, 79, 92, 95, 110, 120-21, 152, 184-86, 220-21, 223.  Medical professionals wanted to biopsy the tissue for fear of cancerous tumors and ensure that there was not a stricture which was impeding his ability to swallow.  Dkt. No. 41 at 218-19, 222.  Espinosa was even scheduled for surgery to remove his tonsils.  Dkt. No. 41 at 52-53, 56-59, 213-15, 219.  Ultimately, it was determined that Espinosa did not require surgery and that there were no growths or lesions in his throat, though he did have acid reflux.  Dkt. No. 41 at 202-05.  Espinosa was counseled on appropriate diet and prescribed medication.  Id.  There is nothing in the record to indicate that these health conditions were attributable to the alleged assault.

Espinosa was seen bi-weekly by medical staff for blood pressure checks because throughout his incarceration he was non-compliant with his medication resulting in uncontrolled hypertension.  Dkt. No. 41 at 129-30, 133, 140-41, 158-63, 166.  In November 2007, Espinosa was first placed in the infirmary and ordered to be supervised by nurses when taking his medication to ensure compliance.  Dkt. No. 41 at 247-54.  During this treatment, Espinosa was informed that his headaches were probably associated with his uncontrolled blood pressure.  Dkt. No. 41 at 254 ("c[omplaints of] h[eadache].  Explained via interpreteur [sic] - h[eadache] cause by [increased] b[lood]p[ressure].")  Espinosa was placed in the infirmary again for non-compliance in July 2008.  Dkt. No. 41 at 244-46.  Espinosa also indicated that he had suffered a head injury in 2005.  Dkt. No. 41 at 168.  There is nothing in the medical record that links the alleged assault with Espinosa's subsequent headaches.

**C. Grievances**[8]

On July 31, 2007, Espinosa filed a grievance related to the alleged assault.   Dkt. No. 40-5 at 70-74.  The Superintendent denied the grievance after receiving the investigatory findings.  Dkt. No. 40-5 at 69;  Dkt. No. 40-6 at 4, 10-11.  Espinosa had been interviewed in conjunction with the investigation, but stated he had nothing additional to add.   Dkt. No. 40-5 at 69; No. 40-6 at 31.  Serrano was interviewed as well and stated that he did not recall any use-of-force incident occurring.  Dkt. No. 40-5 at 69; Dkt. No. 40-6 at 12-13.   McCabe and Arquette also denied any and all allegations, along with Carter and Southworth, though the latter two defendants also stated that they never entered the SHU.  Dkt. No. 40-5 at 69. Hugaboom also observed no injuries to Espinosa during the course of the admissions.  Dkt. No. 40-5 at 69.   The following day, Espinosa was escorted to medical where photos and x-rays were taken, though the x-rays were in conjunction with an unrelated, upcoming, medical procedure.  Dkt. No. 40-5 at 69.   Marks were also noted on Espinosa's body, as were complaints of pain to Espinosa's knee, though that was attributed to a prior injury. Dkt. No. 40-5 at 69.  The medical statement ultimately signed by Espinosa at the conclusion of the examination also failed to indicate alleged abuse.  Dkt. No. 40-5 at 69.  Espinosa again appealed the findings.  Dkt. No. 40-5 at 68, 69, 75-78.  Denial of the grievance was ultimately affirmed by CORC on October 31, 2007, citing "a proper investigation," and insufficient evidence to overturn the denial.  Dkt. No. 40-5 at 67.

---

[8]"The IGP [Inmate Grievance Program] is a three-step process that requires an inmate to: (1) file a grievance with the IGRC [Inmate Grievance Resolution Committee]; (2) appeal to the superintendent within four working days of receiving the IGRC's written response, and (3) appeal to the CORC [Central Office Review Committee] . . . ." Abney v. McGinnis, 380 F.3d 663, 668 (2d Cir.2004) (internal citations omitted).

Espinosa also filed multiple grievances in early 2008, contending that he was receiving inadequate medical treatment.  Dkt. No. 40-5 at 84-88.  These grievances were also denied due to the fact that in the prior six months he had been seen by either a nurse practitioner or facility physician on five occasions.   Dkt. No. 40-5 at 81.  The grievance was appealed and ultimately denied by CORC.   Dkt. No. 40-5 79-80, 82, 89.

## II. Discussion

Espinosa alleges that his Eighth Amendment rights were violated when were deliberately indifferent to his serious medical needs.  Additionally, Espinosa alleges that his Eighth Amendment rights were violated when McCabe, Arquette, Carter, and Southworth used excessive force against him.  Defendants seek dismissal because (1) his constitutional claims are meritless; (2) no evidence exists of the personal involvement of various defendants; and (3) the Eleventh Amendment prohibits suit against defendants in their official capacities.

## A. Legal Standard

A motion for summary judgment may be granted if there is no genuine issue as to any material fact if supported by affidavits or other suitable evidence and the moving party is entitled to judgment as a matter of law. The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. Fed. R. Civ. P. 56; Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Facts are material if they may affect the outcome of the

case as determined by substantive law.  Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986).  All ambiguities are resolved and all reasonable inferences are drawn in favor of the non-moving party. Skubel v. Fuoroli, 113 F.3d 330, 334 (2d Cir. 1997).

The party opposing the motion must set forth facts showing that there is a genuine issue for trial. The non-moving party must do more than merely show that there is some doubt or speculation as to the true nature of the facts. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment.  Gallo v. Prudential Residential Servs. 22 F.3d 1219, 1223-24 (2d Cir. 1994); Graham v. Lewinski, 848 F.2d 342, 344 (2d Cir. 1988).

When, as here, a party seeks summary judgment against a pro se litigant, a court must afford the non-movant special solicitude.  Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 477 (2d Cir. 2006); see also Sealed Plaintiff v. Sealed Defendant #1, 537 F.3d 185, 191-92 (2d Cir. 2008) ("On occasions too numerous to count, we have reminded district courts that 'when [a] plaintiff proceeds pro se, ... a court is obliged to construe his pleadings liberally.'" (citations omitted)).   However, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact. Anderson, 477 U.S. at 247-48.

### B. Personal Involvement

Defendants contend that Espinosa has failed to establish that Donelli was personally

involved in any of the alleged constitutional deprivations and that McCabe, Carter, Arquette, and Southworth were personally involved with his medical care.  "'[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.'"  Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994) (quoting Moffitt v. Town of Brookfield, 950 F.2d 880, 885 (2d Cir. 1991)).  Thus, supervisory officials may not be held liable merely because they held a position of authority.  Id.; Black v. Coughlin, 76 F.3d 72, 74 (2d Cir. 1996).  Supervisory personnel may be considered "personally involved" if:

> (1) [T]he defendant participated directly in the alleged constitutional violation;
>
> (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong;
>
> (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom;
>
> (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts; or
>
> (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995) (citing Williams v. Smith, 781 F.2d 319, 323-24 (2d Cir. 1986)).[9]

---

[9]  Various courts in the Second Circuit have considered how, if at all, the decision in Ashcroft v. Iqbal, 556 U.S. 662 (2009), affected the five Colon factors which were traditionally used to determine personal involvement.  See McCarroll v. Fed. Bureau of Prisons, No. 08-CV-1343 (DNH/GHL), 2010 WL 4609379, at *4 (N.D.N.Y. Sept. 30, 2010) (noting that although the Second Circuit has not yet addressed Iqbal's impact on the five Colon factors, several district courts have done so); Kleehammer v. Monore County, 743 F. Supp. 2d 175 (W.D.N.Y. 2010) (holding that "[o]nly the first and part of the third Colon categories pass Iqbal's muster . . . ."); D'Olimpio v. Crisafi, 718 F. Supp. 2d 340, 347 (S.D.N.Y. 2010) (holding that Iqbal did not eliminate Colon's personal involvement standard).

**1. Donelli**

Espinosa contends that Donelli was personally involved because he pled with Donelli to intervene and Donelli failed to act.  During his deposition, Espinosa stated that because Donelli was "the superintendent of the prison . . . he should know."  Dep. at 34.  In essence, it appears that Espinosa claims Donelli is responsible because of his position in a chain of command, which is insufficient to establish personal involvement.  Wright, 21 F.3d at 501.  Furthermore, "[t]he law is well established . . . that a failure to process, investigate or respond to a prisoner's grievances does not in itself give rise to a constitutional claim."  Rosales v. Kikendall, 677 F. Supp. 2d 643, 650 (W.D.N.Y. 2010) (internal quotation marks and citation omitted).

It is unclear when or how Espinosa approached Donelli.  However, even construing the facts in the light most favorable to Espinosa, the alleged single notice, after the event occurred, is still insufficient.  See Harnett v. Barr, 538 F. Supp. 2d 511, 524 (N.D.N.Y. 2008) (concluding that a distinction lies between a supervisory official that is "confronted with an alleged violation that has ended or . . . is . . . a continuing violation," as with the latter the supervisory officially is deemed "personally involved if he is confronted with a situation that he can remedy directly.") (internal quotation marks and citations omitted).  Moreover, if Espinosa communicated with Donelli via mail, such correspondence is also not enough as receipt of a letter, without personally investigating or acting on the letter or grievance, is also insufficient to establish personal involvement.  See, e.g., Rivera v. Fischer, 655 F. Supp. 2d 235, 238 (W.D.N.Y. 2009) (citing cases); Boddie v. Morgenthau, 342 F. Supp. 2d 193, 203 (S.D.N.Y. 2004) ("While mere receipt of a letter from a prisoner is insufficient to establish individual liability . . . [p]ersonal involvement will be found . . . where a supervisory official

15

receives and acts on a prisoner's grievance or otherwise reviews and responds to a prisoner's complaint.").

Accordingly, defendants' motion on this ground should be granted as to Donelli.


### 2.  McCabe, Arquette, Carter, and Southworth

Espinosa contends that these defendants abandoned him in a cell, while he was moaning and writhing in pain, instead of taking him to the infirmary to receive medical attention.  While it is undisputed that these defendants are not medical providers and thus were not responsible for Espinosa's medical care, Espinosa asserts that they directly interfered with the provision of his care by leaving him in isolation instead of alerting the appropriate medical officials.  This suffices to allege direct involvement in an alleged constitutional violation.  See Baumann v. Walsh, 36 F. Supp. 2d 508, 512 (N.D.N.Y. 1999) ("Non-medical prison personnel engage in deliberate indifference where they intentionally deny access to medical care when the inmate was in extreme pain and has made his medical problem known . . . .") (internal quotation marks and citations omitted).

Accordingly, defendants' motion on this ground should be denied as to these defendants.


### C. Eighth Amendment

The Eighth Amendment explicitly prohibits the infliction of "cruel and unusual punishment."  U.S. Const. amend. VIII.  Eighth Amendment obligations include the duty to protect prisoners from other known harms.  Farmer v. Brennan, 511 U.S. 825, 829 (1970);

16

Matthews v. Armitage, 36 F. Supp. 2d 121, 124 (N.D.N.Y. 1999) (citations omitted).  It also includes the provision of medical care.  Hathaway v. Coughlin, 37 F.3d 63, 66 (2d Cir. 1994).  The test for a § 1983 claim is twofold. First, the prisoner must show that the condition to which he was exposed was sufficiently serious.  Farmer, 511 U.S. at 834. Second, the prisoner must show that the prison official demonstrated deliberate indifference by having knowledge of the risk and failing to take measures to avoid the harm.  Id. "[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted."  Id. at 844.

### 1. Excessive Force

Inmates enjoy an Eighth Amendment protection against the use of excessive force and may recover damages for its violation under § 1983.  Hudson v. McMillian, 503 U.S. 1, 9-10 (1992).  The Eighth Amendment's prohibition against cruel and unusual punishment precludes the "unnecessary and wanton infliction of pain." Gregg v. Georgia, 428 U.S. 153, 173 (1976); Sims v. Artuz, 230 F.3d 14, 20 (2d Cir. 2000).  To bring a claim of excessive force under the Eighth Amendment, a plaintiff must establish both objective and subjective elements.  Blyden v. Mancusi, 186 F.3d 252, 262 (2d Cir. 1999).

The objective element is "responsive to contemporary standards of decency" and requires a showing that "the injury actually inflicted is sufficiently serious to warrant Eighth Amendment protection."  Hudson, 503 U.S. at 9 (internal citations omitted); Blyden, 186 F.3d at 262.  However, "the malicious use of force to cause harm constitute[s] [an] Eighth Amendment violation per se" regardless of the seriousness of the injuries.  Blyden, 186

17

F.3d at 263 (citing Hudson, 503 U.S. at 9).  "The Eighth Amendment's prohibition of 'cruel

and unusual' punishments necessarily excludes from constitutional recognition de minimis

uses of physical force, provided that the use of force is not of a sort repugnant to the

conscience of mankind."  Hudson, 503 U.S. at 9-10 (citations omitted).  "'Not every push or

shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a

prisoner's constitutional rights.'"  Sims, 230 F.3d at 22 (citation omitted).

The subjective element requires a plaintiff to demonstrate the "necessary level of

culpability, shown by actions characterized by wantonness."  Id. at 21 (citation omitted).

The wantonness inquiry "turns on 'whether force was applied in a good-faith effort to

maintain or restore discipline, or maliciously and sadistically to cause harm.'"  Id. (quoting

Hudson, 503 U.S. at 7).  In determining whether defendants acted in a malicious or wanton

manner, the Second Circuit has identified five factors to consider: "the extent of the injury

and the mental state of the defendant[;] . . . the need for the application of force; the

correlation between that need and the amount of force used; the threat reasonably

perceived by the defendants; and any efforts made by the defendants to temper the

severity of a forceful response."  Scott v. Coughlin, 344 F.3d 282, 291 (2d Cir. 2003)

(internal quotation marks and citations omitted).

Defendants' contend that Espinosa's claims are insufficient to establish an Eighth

Amendment violation because they are "unsupported and inconsistent with witness

accounts and the medical records prepared at the time of the alleged event."  Defs. Mem. of

Law (Dkt. No. 40-13) at 8.  Espinosa contends that he was viciously attacked by four

unprovoked corrections officers while he was being compliant and non-resistant.  As a

result of being punched in the face, kicked throughout the head and body, and choked,

18

Espinosa contends he suffered permanent damage to his eye, head, throat, and knee. Espinosa's medical records indicate continued treatment for headaches, vision loss, sore throats, and knee pain. Such injuries could be indicative of suffering multiple blows to the head and body. Moreover, such injuries resulting from the events as described by Espinosa could represent a per se constitutional violation. See Baskerville v. Mulvaney, 411 F.3d 45, 48-49 (2d Cir. 2005).

Similar defects in defendants' argument are noted when evaluating the subjective prong of the analysis. Defendants' contend that on the date in question, Espinosa was escorted into the SHU admissions room, subjected to a strip frisk without any force being used, examined by medical staff who saw no visible injuries, escorted to his cell without incident, and further exposed to a corrections counselor who noticed no visible bodily injuries and noted no complaints of violence. Conversely, Espinosa contends that upon entering the room and disrobing, he was viciously assaulted by McCabe, Carter, Arquette and Southworth, thrown into a cell by Hugaboom and Arquette without receiving medical assistance, and essentially implied that Hugaboom and Serrano lied about the documents that they filed allegedly witnessing Espinosa, without injuries, prior to and after the strip frisk. These allegations were consistently asserted by Espinosa in the inmate incident report, grievance, complaint, and deposition.

This competing evidence rests on the credibility of Espinosa on the one hand and defendants on the other. In these circumstances, the governing law that the evidence must be viewed in the light most favorable to the non-moving party, leaves no choice but to credit Espinosa's version of events for purposes of this motion. See In re Dana Corp., 574 F.3d 128, 152 (2d Cir. 2009) (holding that a court faced with a motion for summary judgment

19

must draw all reasonable inferences in favor of the non-moving party and may not make credibility determinations or weigh the evidence, functions which are reserved to a jury and not a judge) (citing cases).

As described above, Espinosa's evidence would establish that the use of force was an unnecessary tactic implemented not to restore or maintain order, but to maliciously assault an inmate for no apparent reason.  Moreover, such actions in assaulting this inmate could constitute a per se constitutional violation.  Thus, viewing the facts in the light most favorable to Espinosa, he has proffered sufficient evidence to raise an issue of fact as to the objective prong of the Eighth Amendment analysis to require resolution by a jury.  Furthermore, if Espinosa's evidence is credited, the actions of McCabe, Arquette, Carter, and Southworth could be found wanton and malicious.  The need for force in response to behavior which was both compliant and non-threatening could be deemed malicious.  This conduct could be found unreasonable and unnecessary to sustain institutional order and safety.  Thus, such actions, as alleged by Espinosa, are more than sufficient as well to raise a question of material fact as to the subjective prong of the Eighth Amendment analysis.

Accordingly, defendants' motion for summary judgment on this ground should be denied.

## 2.  Medical Care

"'Because society does not expect that prisoners will have unqualified access to healthcare,' a prisoner must first make [a] threshold showing of serious illness or injury" to state a cognizable claim.  Smith v. Carpenter, 316 F.3d 178, 184 (2d Cir. 2003)(quoting Hudson, 503 U.S. at 9).  Because there is no distinct litmus test, a serious medical

condition is determined by factors such as "(1) whether a reasonable doctor or patient would perceive the medical need in question as 'important and worthy of comment or treatment,' (2) whether the medical condition significantly affects daily activities, and (3) the existence of chronic and substantial pain."  Brock v. Wright, 315 F.3d 158, 162-63 (2d Cir. 2003)(citing Chance v. Armstrong, 143 F.3d 698, 702 (2d Cir. 1998)).  The severity of the denial of care should also be judged within the context of the surrounding facts and circumstances of the case.  Smith, 316 F.3d at 185.

Deliberate indifference requires the prisoner "to prove that the prison official knew of and disregarded the prisoner's serious medical needs."  Chance v. Armstrong, 143 F.3d 698,  702 (2d Cir. 1998).  Thus, prison officials must be "intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed."  Estelle v. Gamble, 429 U.S. 97, 104 (1976).  "Mere disagreement over proper treatment does not create a constitutional claim" as long as the treatment was adequate.  Chance, 143 F.3d at 703.  Thus, "disagreements over medications, diagnostic techniques (e.g., the need for X-rays), forms of treatment, or the need for specialists . . .  are not adequate grounds for a section 1983 claim."  Sonds v. St. Barnabas Hosp. Corr. Health Servs., 151 F. Supp. 2d 303, 312 (S.D.N.Y. 2001).

Here, Espinosa contends that defendants failed to provide him with appropriate medical care for his eye, head, knee, and shoulder and interfered with the provision of such care.

### a.  Provision of Medical Care

While Espinosa did not identify any medical professionals by name in his complaint, he proffers general complaints of inadequate medical care.  The medical record shows entries

for both the day that the alleged assault occurred, as well as the day after.  Espinosa was also seen by medical staff six times in the following two weeks.  There were no additional complaints of pain or injury to his eyes, head, throat, shoulder or knee.  Records also indicate the provision of several medications for his various health care needs.  Such repeated contacts and the provision of medication belie a claim of deliberate indifference.

Furthermore, Espinosa received an x-ray of his knee and shoulder and was photographed in conjunction with his incident injury report.  Espinosa's contentions that his radiology testing should have encompassed additional body parts or that the photographs should have been taken in a different manner are insufficient to establish an Eighth Amendment claim.  Chance, 143 F.3d at 703. The injury report also indicated a medical examination by documenting the bruises on his arms and complaints of pain to both the knee and shoulder.  The medical record also reflects that over-the-counter pain relievers were provided to Espinosa when he was seen by medical staff four days later. Documentation of injuries and provision of pain relievers also obviate claims of deliberate indifference.

Accordingly, defendants' motion should be granted on this ground.


**b.  Interference with Provision of Medical Care**

Espinosa contends that McCabe, Arquette, Carter, Southworth, and Hugaboom also left him in his cell, while injured, refusing to refer medical to him for provision of much needed medical care.  "Non-medical prison personnel engage in deliberate indifference where they intentionally deny access to medical care when the inmate was in extreme pain and has made his medical problem known . . . ."  See Baumann v. Walsh, 36 F. Supp. 2d 508, 512

22

(N.D.N.Y. 1999) (internal quotation marks and citations omitted).  Viewing the facts in the light most favorable to Espinosa, he asserts that after being assaulted and losing consciousness, McCabe, Carter and Southworth abandoned him and failed to provide notification to the proper individuals that medical assistance was necessary.  Moreover, defendants Arquette and Hugaboom moved Espinosa, who was moaning in pain, to a cell where they left him.  Aide did not come until the next morning and, regardless of whose version of events is credited, medical was not notified by any of the above named defendants.  Thus, their actions or inaction raise a question of material fact as to whether they intentionally delayed Espinosa's access to medical care.

Accordingly, defendants' motion should be denied on this ground.


### D. Conspiracy

Espinosa alleges that the Arquette, Carter, Southworth, and McCabe conspired to use excessive vorce against Espinosa.  In order to support a claim for conspiracy pursuant to § 1985, there must be "(1) an agreement . . . ; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages."  Ciambriello v. County of Nassau, 292 F.3d 307, 324-25 (2d Cir. 2002); Cusamano v. Sobek, 604 F. Supp. 2d  416, 468 (N.D.N.Y. 2009).  An agreement must be alleged with specificity as bare allegations of a conspiracy supported only by allegations of conduct easily explained as individual action is insufficient.  See  Iqbal v. Hasty, 490 F.3d 143,177 (2d Cir. 2007); see also Gyadu v. Hartford Ins. Co., 197 F.3d 590, 591 (2d Cir.1999).  Thus, Espinosa must "make an effort to provide some details of time and place and the alleged effects of the conspiracy . . . [including] facts to demonstrate that the defendants entered into an

agreement, express or tacit, to achieve the unlawful end." Warren v. Fischl, 33 F. Supp. 2d

171, 177 (E.D.N.Y. 1999) (citations omitted).  While exact specifics are not required, "the

pleadings must present facts tending to show agreement and concerted action." Anilao v.

Spota, 774 F. Supp. 2d 457, 512-13 (E.D.N.Y. 2011) (citations omitted).  Conclusory,

vague, and general allegations are insufficient to support a conspiracy claim. Ciambriello,

292 F.3d at 325.

Espinosa alleges a general conspiracy between all defendants employed by DOCCS.

These claims are conclusory and fail to establish how, when or why defendants at different

levels of management colluded and formed these alleged schemes.  While specifics are

unnecessary, Espinosa fails to provide any plausible information which would lend

credence to his claims of an explicit or implicit agreement between any or all of these

defendants.  Accordingly, defendants' motion as to the claims of conspiracies should be

granted.


### E. Eleventh Amendment

Espinosa sues the defendants in both their individual and official capacities.  Compl.

Defendants seek summary judgment on Espinosa's claims against them in their official

capacities.  The Eleventh Amendment provides that "[t]he Judicial power of the United

States shall not be construed to extend to any suit in law or equity, commenced or

prosecuted against one of the United States by Citizens of another State, or by Citizens or

Subjects of any Foreign State."  U.S. Const. amend. XI.  "[D]espite the limited terms of the

Eleventh Amendment, a federal court [cannot] entertain a suit brought by a citizen against

his [or her] own State."  Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 98 (1984) (citing Hans v. Louisiana, 134 U.S. 1, 21 (1890)).  Regardless of the nature of the relief sought, in the absence of the State's consent or waiver of immunity, a suit against the State or one of its agencies or departments is proscribed by the Eleventh Amendment. Halderman, 465 U.S. at 100.  Section 1983 claims do not abrogate the Eleventh Amendment immunity of the states. See Quern v. Jordan, 440 U.S. 332, 340-41 (1979).

A suit against a state official in his or her official capacity is a suit against the entity that employs the official.  Farid v. Smith, 850 F.2d 917, 921 (2d Cir. 1988)(citing Edelman v. Jordan, 415 U.S. 651, 663 (1974)). "Thus, while an award of damages against an official in his personal capacity can be executed only against the official's personal assets, a plaintiff seeking to recover on a damages judgment in an official-capacity suit must look to the government entity itself," rendering the latter suit for money damages barred even though asserted against the individual officer. Kentucky v. Graham, 473 U.S. 159, 166 (1985). Here, Espinosa seeks monetary damages against defendants in their official capacities for acts occurring within the scope of their duties with DOCCS.  Thus, the Eleventh Amendment bar applies and serves to prohibit Espinosa's claim for monetary damages against defendants in their official capacities.

Accordingly, it is recommended that defendants' motion on this ground be granted.

### III. Motion to Amend

Rule 15(a) provides that a court should grant leave to amend "freely . . . when justice so requires."  When exercising its discretion, a court must examine whether there has been undue delay, bad faith, or dilatory motive on the part of the moving party.  Evans v.

Syracuse City School District, 704 F.2d 44, 46 (2d Cir. 1983) (citing Foman, 371 U.S. at 182).  The court must also examine whether there will be prejudice to the opposing party. See, e.g., Ansam Associates Inc. v. Cola Petroleum, Ltd., 760 F.2d 442, 446 (2d Cir.1985) (permitting proposed amendment would be especially prejudicial once discovery has been completed and a summary judgment motion filed).  Finally, where it appears that granting leave to amend is unlikely to be productive or the amendment is futile, it is not an abuse of discretion to deny leave to amend.  Ruffolo v. Oppenheimer & Co., 987 F.2d 129, 131 (2d Cir. 1993) (citations omitted).

Espinosa seeks to add various defendants to his claim and new causes of action.  For the reasons articulated below the motion to amend should be granted in part and denied in part.

### 1.  Individual Defendants

### a. Serrano and Hugaboom

Espinosa seeks leave to substitute Serrano and Hugaboom for two of the "John Doe" defendants.  Serrano and Hugaboom were both previously identified and interviewed by defendants, providing affidavits in support of the present motion for summary judgment. When determining whether to properly dismiss a John or Jane Doe defendant, dismissal on 4(m) grounds is precluded when the inmate has "provide[d] information necessary to identify the defendant . . . ."  Murray v. Pataki, 378 Fed. Appx. 50, 52 (2d Cir. 2010) (citations omitted).  Using similar logic, it appears that given defendants' actual knowledge of Hugaboom's alleged activity in the present case, his easy identification, and defendants'

actions in already interviewing him, they will suffer no prejudice with him being added as a defendant.  While Serrano was not initially named in any capacity.  The same argument holds true.  Defendants have had the opportunity and benefit of his testimony, thus even though the timing of the motion to amend is late, it is not prejudicial in this respect.

Addition of both of these defendants is also relevant to the issues concerning Espinosa's Eighth Amendment interference with medical treatment claims.  Both defendants have been identified as speaking and seeing to Espinosa on the date of the alleged assault and neither informed medical personnel of Espinosa's proffered severe injuries.  Thus, the divergence in testimony results in a credibility determination and also a question about the material facts of the case.

Accordingly, Espinosa's motion to amend with respect to these defendants is granted.

#### b.  Mulverhill, Gonzalez and LaRock

Espinosa also seeks to substitute these three defendants for "John/Jane Doe" defendants.  For the reasons stated above, Mulverhill should be substituted as the named Jane Doe defendant.  However, addition of claims against Mulverhill, Gonzalez or LaRock would be futile for the reasons articulated above.  These three individuals were involved in the medical interview and treatment provided on July 27, the day subsequent to the alleged assault.  It is uncontroverted that during that appointment Espinosa was examined, given an x-ray, photographed, and provided with pain medication.  While Espinosa disagrees with the type of pain medication provided (See Proposed Am. Compl. (Dkt. No. 47) ¶ 54, preferring pain relief stronger than an over the counter medication, or amount of radiology reports or photographs taken, such decisions are within the purview of the medical

department.  Disagreements with diagnoses and courses of treatment are insufficient to

establish an Eighth Amendment claim.  Sonds, 151 F. Supp. 2d at 312.  Moreover, for

reasons discussed infra Espinosa had no constitutional right to an investigation or

grievance program.  Therefore, to the extent that these photographs were to be used in

conjunction with an investigation or the grievance program, such complaints are insufficient

to establish a constitutional claim.  Accordingly, Espinosa's motion to amend to add these

three as defendants is denied on this ground.


### c.  Jubert

Espinosa seeks to add Jubert for his position as an acting Superintendent and

dissemination of a memorandum that apparently misinformed other officers how to initiate

and complete an investigation.  Proposed Am. Compl. ¶ 14.  Addition of this defendant

would also be futile for similar reasons outlined with Donelli.  Position in a hierarchical chain

of command is insufficient to establish personal involvement, which is necessary in a §

1983 claim.  Wright, 21 F.3d at 501.  Moreover, Espinosa failed to establish that, as acting

Superintendent, Jubert was responsible for the creation of the aforementioned policy.  Even

if he was, the amendment would still be futile for multiple reasons.  First, for reasons

discussed infra, Espinosa is not entitled to any particular investigation as an inmate.

Second, Espinosa misstates the policy, which instructs individuals to gather all information,

including concise and direct written statements unequivocally expressing the parties' sides,

and "evaluate [the evidence and prepare a statement] . . . to the extent that it supports or

refutes the allegations made by the [inmate]."  Dkt. No. 47-1 at 40.  This memorandum

promotes objective findings after an investigation where contact is to be made with all

relevant parties, including both the corrections officers against who the grievance was filed as well as the inmate making the complaints.  Id.  Therefore, Espinosa's motion to amend is denied on these grounds.

### d. Johnson

Espinosa seeks to add Johnson as a defendant based upon how he conducted the investigation into Espinosa's use of force grievance.  Proposed Am. Compl. ¶ 16.  This amendment is futile because even viewing the facts in the light most favorable to Espinosa, he has failed to state a claim upon which relief can be granted because he has no constitutional right to an investigation.  See Carrasquillo v. City of N.Y., 324 F.Supp.2d 428, 438 (S.D.N.Y. 2004) (holding that prisoners have "no constitutional or federal right to an investigation into . . . [an] accident, or to have his requests for an investigation answered").  Therefore, Espinosa's motion to amend should be denied on these grounds.

### e.  Jane Doe

Espinosa also seeks to add a Jane Doe nurse to his complaint.  Proposed Am. Compl. ¶ 17.  This is presumably the same Jane Doe from his initial complaint which, unlike Hugaboom and Mulverhill, have not been identified by either Espinosa or defendants throughout the course of discovery.  Rule 4(m) of the Federal Rules of Civil Procedure provides in part:

> If a defendant is not served within 120 days after the complaint is filed, the court-on motion or on its own after notice to the plaintiff-must dismiss the action without prejudice against that defendant or order that service be made within a specified time.

> But if the plaintiff shows good cause for the failure, the court must
> extend the time for service for an appropriate period.

Accordingly, as more than 120 days have passed, this defendant should be dismissed from the original complaint.  For these same reasons, allowing amendment to include this defendant is futile.  Accordingly, Espinosa's motion to amend is denied on these grounds.

### f.  The State of New York

Espinosa also seeks to add the State of New York as a defendant in his complaint. Proposed Am. Compl. ¶ 19.  Such amendments would be futile because Eleventh Amendment immunity bars § 1983 suits against the state of New York.  See Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 98 (1984) (citing Hans v. Louisiana, 134 U.S. 1, 21 (1890)); Quern v. Jordan, 440 U.S. 332, 340-41 (1979).  Accordingly, Espinosa's motion on this ground is denied.

### g.  County of Franklin

Espinosa also seeks to add the County of Franklin as a defendant in his complaint. Proposed Am. Compl. ¶ 18.  Espinosa contends that Franklin County "failed to establish proper and effective safeguards to protect a prisoner/inmate from being abused by prison officials and prison nurses . . . ."  Id.  Espinosa fails to articulate how the county was involved or which policies it created or endorsed which were unconstitutional.  Accordingly, allowing amendment of the complaint would be futile and Espinosa's motion on this ground is denied.

### 2.  Causes of Action

### a. Use of Force

Defendants' discovery has concerned the actions and inactions which occurred on July 26, including testimony, documentation, and medical records from the previously named defendants, as well as the two just recommended to be added to the complaint. Accordingly, Espinosa's amended complaint should be granted to the extent that it encompasses the events which occurred on July 26, before and after the use of force. Proposed Am. Compl. ¶ 22-34.

### b.  Failure to Investigate & Follow DOCCS Grievance Procedures

As previously stated, Espinosa's claims relating to his right to an investigation are not cognizable and, thus, are futile.  Carrasquillo, 324 F.Supp.2d at 438.  To the extent that Espinosa contends any defendant failed to follow DOCCS procedures related to investigations or the grievance program, such claims are similarly futile.  Proposed Am. Compl. ¶¶ 55-64.  This is because any contentions alleging compensation for defendants' failure to comply with DOCS policies and protocols for investigating grievances are not recognized as constitutional rights.  Bolden v. Alston, 810 F.2d 353, 358 (2d Cir. 1987) ("State procedural requirements do not establish federal constitutional rights.  At most, any violation of state procedural requirements would create liability under state law . . . . "). Furthermore, "inmate grievance programs created by state law are not required by the Constitution and consequently allegations that prison officials violated those procedures does not give rise to a cognizable § 1983 claim."  Shell v. Brzezniak, 365 F. Supp. 2d 362,

370 (W.D.N.Y. 2005) (citations omitted); see also Cancel v. Goord, No. 00-CV-2042 (LMM), 2001 WL 303713, at *3 (S.D.N.Y. Mar. 29, 2001) ("[I]nmate grievance procedures are not required by the Constitution and therefore a violation of such procedures does not give rise to a claim under § 1983.") (citations omitted).  Thus, to the extent Espinosa complains about the mechanics of how his grievance was initiated, investigated, or decided, such contentions are meritless.[10]


### c. Conspiracy

Espinosa also alleges that the defendants he sought to add to the complaint were involved in a global conspiracy.  Proposed Am. Compl. ¶¶ 35, 52.  While exact specifics are not required, "the pleadings must present facts tending to show agreement and concerted action."  Anilao v. Spota, 774 F. Supp. 2d 457, 512-13 (E.D.N.Y. 2011) (citations omitted).  Conclusory, vague, and general allegations are insufficient to support a conspiracy claim.  Ciambriello, 292 F.3d at 325.  For the same reasons stated above, these vague and conclusory allegations also fail to establish how, when or why defendants' different levels of management colluded and formed these alleged schemes.  Espinosa similarly fails to provide any plausible information which would lend credence to his claims of an explicit or implicit agreement between any or all of these defendants.  Therefore, Espinosa's motion to amend as to the conspiracy claim is denied.

---

[10]However, "[i]f prison officials ignore a grievance that raises constitutional claims, an inmate can directly petition the government for redress of that claim." Shell, 365 F. Supp. 2d at 370 (citations omitted).

32

### IV. Espinosa's Motion to Amend His Response
### to Defendants' Motion for Summary Judgment

The motion to amend/correct is composed of a statement of material facts,

memorandum of law, and proposed stipulation of consent to defendants' counsel.  Dkt. No.

54.  Defendants have opposed that motion.  Dkt. No. 55.  Espinosa's motion to

amend/correct has been reviewed and considered, as the submission primarily represents

his legal arguments and does not include additional proof which was not otherwise in

evidence and previously evaluated by the undersigned.  Accordingly, consideration of

Espinosa's motion was not prejudicial to defendants, the motion is granted, and there is no

need for defendants to file a reply.

### V. Conclusion

For the reasons stated above, it is hereby:

1. **RECOMMENDED** that defendants' motion for summary judgment (Dkt. No. 40)

be:

A. **DENIED** as to all Eighth Amendment claims against defendants McCabe,

Arquette, Carter, and Southworth; and

B. **GRANTED** as to all other claims and defendants;

2. **ORDERED** that:

A. Espinosa's motion for leave to file an amended complaint (Dkt. No. 47) be:

1. **GRANTED** as to ¶¶ 22-34 and to the extent that it adds Hugaboom and

Serrano as defendants;

2. **DENIED** as to all other proposed claims and defendants; and

3. Espinosa shall file and serve an amended complaint in accordance with this decision on or before **September 15, 2012**; and

B. Espinosa's motion to amend/correct his summary judgment response (Dkt. No. 54) is **GRANTED**.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.**  Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993); Small v. Sec'y of HHS, 892 F.2d 15 (2d Cir. 1989); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).

Dated:  August 28, 2012
        Albany, New York

David R. Homer
United States Magistrate Judge